UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

D.M.,

                                        Defendant.

**SENTENCING
MEMORANDUM,
HEARING AND ORDER**

12-CR-170

**JACK B. WEINSTEIN, Senior United States District Judge:**

For the Government:

> Loretta E. Lynch, Esq.
> United States Attorney
> Eastern District of New York
>
> By:     Hilary L. Jager, Esq.
>         Assistant United States Attorney

For the Defendant:

> David M. Chidekel, Esq.
> New York, New York

# Table of Contents

I.    Introduction ....................................................................................................... 3

II.   Facts and Procedural History ............................................................................ 6

    A.    Offense ......................................................................................................... 6

    B.    Pre-Arrest Conduct ..................................................................................... 7

    C.    Indictment and Post-Arrest Conduct.......................................................... 7

    D.    Guilty Plea ................................................................................................... 9

    E.    Victim Impact ............................................................................................ 11

    F.    Sentencing Hearing ................................................................................... 11

III.  Testimony of Treating Therapists and Experts ............................................... 12

    A.    Expert Testimony at Sentencing Necessary.............................................. 12

    B.    Unanimous Recommendations of Treating Therapists and Experts for Non-
          Incarceration ............................................................................................. 17

        1.    Treating Therapists ............................................................................. 18

           a)   Dr. Richard Krueger ...................................................................... 18

           b)   Dr. Meg S. Kaplan ........................................................................ 21

           c)   Dr. Douglas Martinez.................................................................... 21

        2.    Non-Treating Experts .......................................................................... 23

           a)   Dr. Cheryl Paridis ......................................................................... 23

           b)   Dr. N.G. Berrill and Dr. Jennifer A. McCarthy ........................... 25

IV.  Sentencing Law ............................................................................................... 26

V.   Application of Law to Facts ............................................................................ 29

    A.    Guidelines Calculation .............................................................................. 29

    B.    Section 3553(a) Factors ............................................................................. 31

        1.    Sufficient But Not Greater Than Necessary ....................................... 31

        2.    Nature and Circumstances of the Offense; History and Characteristics of the
           Defendant ............................................................................................ 31

        3.    Reflect the Purposes of Sentencing.................................................... 33

        4.    Kinds of Sentences Available and Sentencing Range Established ...... 36

        5.    Guidelines, Policy, and Other Criteria of the Sentencing Commission.... 37

        6.    Avoid Unwarranted Sentence Disparities .......................................... 38

        7.    Provide Restitution.............................................................................. 40

    C.    Public Policy .............................................................................................. 40

    D.    Sentence Imposed ...................................................................................... 46

VI.  Conclusion ....................................................................................................... 47

VII. Appendix .......................................................................................................... 49

    A.    Professional Background of Experts.......................................................... 49

2

    1.      Richard B. Krueger, M.D.............................................................................. 49
    2.      Meg S. Kaplan, Ph.D. ................................................................................. 49
    3.      Douglas Martinez, Ph.D .............................................................................. 50
    4.      Cheryl Paradis, Psy. D. .............................................................................. 50
    5.      N.G. Berrill, Ph.D. ..................................................................................... 50
    6.      Jennifer A. McCarthy, Ph.D. ..................................................................... 51
  B.      Transcript of Conference of Expert Discussion with the Court.................................... 52

## I.      Introduction

This case illustrates the sensible cooperation of prosecutor, defense, experts and the court to save rather than destroy an adolescent found to have used his computer to view child pornography.

This defendant, D.M., was originally charged with receiving and possessing child pornography, requiring a minimum prison sentence of five years.  Following a guilty plea, at a hearing on March 22, 2013, defendant, now age 22, was sentenced for one count of possession of child pornography in violation of 18 U.S.C. §2252(a)(4)(B).  Imposed was a non-Guidelines sentence of five years' probation with substantial continuing controls and treatment.  *See* Part V.D, *infra* (outlining specifics of sentence).  The reasons for the sentence were orally explained in open court.  They are elaborated upon in this memorandum.

Defendant admits to having possessed several hundred still images and video files of children engaging in sexually explicit conduct.  When he was an adolescent, he obtained them from the Internet on his home computers.  His treating therapists and the parties' experts are in agreement with the court that he suffers from a treatable pornography obsession that began in his early teenage years.  There was no evidence that the defendant produced any such materials.

Apart from using a computer, defendant has never acted out against a child or anyone else.  Demonstrated by convincing evidence is that he poses no current or future risk to any child

or adult. Since his collection of child pornography was discovered by the government, defendant has undergone nearly two years of successful therapeutic treatment. Expert witnesses presented by both the government and defendant recommend that this treatment continue in a non-incarceratory environment and that a term of imprisonment is not required to avoid any danger to the public. Defendant is found by the experts to be fully capable of utilizing therapeutic treatment under probation while under strict control of the court's Probation Department. *See* Part III.B., *infra*.

The crime is serious. Punishment is required. Defendant's guilty plea will result in the stain of a federal felony conviction for a sex-related crime. Extensive restrictions affecting where he can live and work, and how he will be controlled, will follow him for many years.

Having been convicted of a crime of possession—and not production, receipt or distribution—of child pornography, no statutory mandatory term of imprisonment is required. Outside the ambit of a mandatory-minimum sentence, a trial court is required to account for a variety of factors and considerations when meting out a sentence. *See* 18 U.S.C. § 3553(a); Part IV, *infra*. *See also Ewing v. California*, 538 U.S. 11, 34-35 (2003) (Stevens, J., dissenting) ("[B]efore guideline sentencing became so prevalent[,]. . . . sentencing judges wisely employed a proportionality principle that took into account all of the justifications for punishment—namely, deterrence, incapacitation, retribution, and rehabilitation.").

The Guidelines developed by United States Sentencing Commission are to be used as a starting point only. *Gall v. United States*, 552 U.S. 38, 50 (2007). Recommended by the Guidelines is a prison term of seventy-eight to ninety-seven months. *See* Part V.A, *infra.*

In addition to consulting the Guidelines, an "individualized assessment" of the situation at-hand "based on the facts presented" is required. *Gall*, 552 U.S. at 50. That analysis is guided by "[r]easonableness" and an "*individualized* application of the statutory sentencing factors." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall*, 552 U.S. at 46-47) (emphasis added). Those factors militate in favor of a non-Guidelines—and non-incarceratory— sentence. *See* Part V.B, *infra*.

Cases supporting long terms of imprisonment for non-acting-out adolescents such as this defendant have been strongly attacked as unsound and as fundamentally deviating from the Guidelines' overarching policy and expertise. *See, e.g.*, *Dorvee*, 616 F.3d at 188. The Court of Appeals for the Second Circuit has expressly "recognize[d] the district courts' post-*Booker* authority to 'vary from the Guidelines range based solely on a policy disagreement with the Guidelines, and encourages courts to take seriously that discretion in 'fashioning sentences under § 2G2.2' [of the Guidelines] for child pornography defendants." *United States v. Chow*, 441 Fed. App'x 44, 45 (2d Cir. 2011) (citing *Dorvee*, 616 F.2d at 188); *accord United States v. Tutty*, 612 F.3d 128, 131 (2d Cir. 2010) ("[A] district court *may* depart from the Guidelines based solely on a policy disagreement.") (emphasis in original).

*United States v. C.R.*, 792 F. Supp. 2d 343, 490-518 (E.D.N.Y. 2011), *appeal pending*, 11-2826 (2d Cir.), discussed the cruel and unusual nature of applying a statutory five year mandatory-minimum sentence to an adolescent who views child pornography. Much of the reasoning in that opinion supports the conclusion in the instant case that the Guidelines applicable to this defendant, D.M., are not appropriate. *See id.* at 494-95 (describing excessive child pornography incarceration terms); *id.* at 507 (child pornography mandatory-minimum

sentence does not reflect the "range of culpability for child pornography offenses"). Often, the child pornography Guidelines are untethered to the "Commission's exercise of its characteristic institutional role." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). If applied in the instant case, the extremely high calculated Guidelines range would "generate unreasonable results." *Dorvee*, 616 F.3d at 188.

An incarceratory Guidelines sentence will impede or cause regression in the substantial progress that defendant has made through individual and group therapy while on bail. Justice for the victims of this crime—and for society's future interest in seeing to it that defendant engages in no further criminal activity—is best served through treatment and supervision outside of prison.

## II.     Facts and Procedural History

### A.     Offense

In October 2010, an Internet protocol address associated with defendant's household was identified by an agent from the United States Department of Homeland Security who was investigating computers within the New York area that were, or had been, sharing images and videos depicting child pornography. Presentence Report ("PSR") ¶ 3 (Oct. 26, 2012).

Following execution of a search warrant on April 29, 2011, a laptop computer and desktop computer allegedly belonging to defendant were seized. *Id.* ¶¶ 3-5. They contained videos and images depicting child pornography. *Id.* ¶¶ 4-5. A subsequent forensic analysis of the computers revealed at least 356 images and 231 videos depicting child pornography. *Id.* ¶ 8. The victims depicted ranged from age 3 to 17. *Id.*

At the time of the search, defendant admitted to ownership of the computers and to having downloaded child pornography onto them using peer-to-peer file-sharing systems. *Id.* ¶ 6. He further admitted that he had started looking at child pornography in high school and that his viewing had "gotten out of control." *Id.*

**B.     Pre-Arrest Conduct**

In May 2011, just days after his home was searched, defendant voluntarily sought assistance at the Krueger-Kaplan Behavioral Medicine Program in New York City ("Krueger-Kaplan Program"). Addendum to PSR 1 (Nov. 6, 2012); Def.'s Sentencing Mem., Feb. 4, 2013, ECF No. 30 ("Def. Mem."), at 14, Def. Mem., Ex. C (brochure of Krueger-Kaplan Program); Def. Mem., Ex F (Expert Report of Dr. Robert Krueger, May 3, 2012 ("Krueger May Rep.")), at 1. After a screening interview, on May 12, 2011, defendant began individual therapy with Dr. Meg Kaplan. *See* Def. Mem., Ex. H (Expert Report of Dr. Meg S. Kaplan, Oct. 30, 2012 ("Kaplan Rep.")) at 1; *see* Appendix A, *infra* (Dr. Kaplan's qualifications). She describes defendant as having "made excellent progress in therapy." *Id.*

**C.     Indictment and Post-Arrest Conduct**

A criminal complaint was filed on February 3, 2012. *See* Sealed Compl., Feb. 3, 2012, ECF No. 1. It alleges that defendant knowingly *possessed and received* images and videos depicting child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1). *Id.* An arrest warrant was issued on the same day. *See* Arrest Warrant, Feb. 3, 2012, ECF No. 2. Without incident, he was arrested the next week. PSR ¶ 7. Additional computers and an iPod seized from him during the arrest contained no child pornography. *See* Gov't Sentencing Mem., Feb. 14, 2013, ECF No. 33 ("Gov't Mem.") 2.

On March 6, 2012, defendant was indicted on four counts. *See* Indictment, Mar. 6, 2012, ECF No. 7. Counts One through Three charged him with knowingly and intentionally *receiving* one or more pornographic visual depictions in violation of 18 U.S.C. § 2252(a)(2). *Id.* A conviction on any of the crimes charged in Counts One through Three would have resulted in a mandatory-minimum sentence of five years. *See* 18 U.S.C. § 2252(b)(1) ("Whoever violates, or attempts to violate [the prohibition of knowingly receiving images or videos of child pornography] shall be . . . imprisoned not less than 5 years. . . ."). Count Four charged him with *possession* of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). *See* Indictment, Mar. 6, 2012, ECF No. 7. No mandatory-minimum sentence applies for a conviction of possession of child pornography. *See* 18 U.S.C. § 2252(b)(2) ("Whoever violates, or attempts or conspires to violate [the prohibition on possession of image or videos of child pornography] shall be . . . imprisoned not more than 10 years. . . .").

Based upon the automatic file-sharing system he used, persons in defendant's position have been charged with *distributing* these materials pursuant to 18 U.S.C. 2252(a)(2), carrying a five year minimum prison sentence. *See United States v. Caparotta*, 890 F. Supp. 2d 200, 209 (E.D.N.Y. 2012) (holding that "defendant who places files containing child pornography in a shared folder accessible to others via a P2P program on the internet can be charged with 'distribution' under Section 2252(a)(2)"). *But see C.R.*, 792 F. Supp. 2d at 355 (requiring both "active intention to give or transfer" child pornography and "active participation in the actual delivery" to charge a defendant with "distribution" under § 2252(a)(2)).

Shortly after he was indicted, defendant voluntarily submitted to two polygraph examinations. The first was administered on March 29, 2012 by a service retained by the

defense. *See* Def. Mem., Ex. A (polygraph report of Mar. 29, 2012). The examiner of this first test concluded that no deception was manifested when D.M. answered "No" to questions related to whether he had engaged in any sexual relations with a child in the previous four years. *Id*. On May 22, 2012, the government administered a second polygraph examination. *See* Def. Mem., Ex. B (polygraph report of May 22, 2012). It found no deception when defendant answered "No" to the following questions: "Have you let a minor touch your penis since becoming an adult?" and "Have you touched the sexual organs of a minor since your 18th birthday?" *Id*.

About the time defendant was arrested, at Dr. Meg Kaplan's recommendation, he commenced group sex offender therapy under the treatment of Dr. Douglas Martinez. *See* Appendix A, *infra* (Dr. Kaplan's and Dr. Martinez's credentials). Defendant was "not originally forthcoming [at group therapy], apparently due to anxiety, [but] did warm up and he became more verbal and participatory after several sessions." Def. Mem., Ex. D (Expert Report of Douglas Martinez, Ph.D., Oct. 29, 2012 ("Martinez Rep.")) 2.

In May 2012, a psychiatric and risk assessment evaluation was performed by Dr. Richard Krueger, a well-recognized expert in the field of sex offender treatment. PSR ¶ 41. *See* Appendix A, *infra* (Dr. Krueger's credentials). Buttressing the conclusions of the polygraph examinations, Dr. Krueger found "no indication that [the defendant] has ever attempted to abuse or actually abused a minor." *Id*.

### D.    Guilty Plea

Following the polygraphs, therapy and psychiatric and risk assessments, a plea negotiated between defense counsel and the United States Attorney for the Eastern District of New York was entered into before the assigned magistrate judge on July 9, 2012. *See* Minute Entry, July 9,

2012, ECF No. 18.  Pursuant to an agreement with the government, defendant pled guilty to Count Four of the indictment, but not to Counts One through Three.  *Id.*  By doing so, the mandatory-minimum sentence of five years for receiving images and videos of child pornography was avoided, as was the possibility of an amendment to the charge for distribution of child pornography carrying with it an additional mandatory-minimum sentence of five years.

The United States Attorney made a responsible decision to avoid an unnecessarily harsh and counterproductive punishment by allowing a plea to a possession count.  *See* Troy Stabenow, *A Method of Careful Study:  A Proposal for Reforming Child Pornography Guidelines*, 24 Fed. Sent'g Rptr. 108, 111-12 (2011) ("From an evidentiary standpoint, the forensic evidence necessary to prove possession nearly always provides the basis for at least adding a receipt charge [carrying a mandatory-minimum sentence] as well."),  *Cf. C.R.*, 792 F. Supp. 2d at 349 (indicating that mandatory-minimum sentences for child pornography offenses "will cause serious and unnecessary harm to adolescent defendants by applying a mechanical and unnecessarily harsh sentencing scheme to address the broad range of culpability and circumstances involved in child pornography"); *United States v. Dossie*, 851 F. Supp. 2d 478, 485-89 (E.D.N.Y. 2012) (Gleeson, J.) (discussing United States Attorney's authority to mitigate harshness of drug-offense mandatory-minimum sentences through exercise of prosecutorial discretion); *United States v. Bennett*, Crim. Action No. 2:11cr191–MHT, 2012 WL 5512280, at *3 (M.D. Ala. Nov. 14, 2012) (Thompson, J.) ("At the end of the day, the fate of many drug-trafficking defendants lies mostly with the government's prosecutors and only slightly with the court.").

### E.      Victim Impact

Submitted by the government are several statements by the victims of the child pornography shown on defendant's computers.  *See* Gov't Mem., Ex. B. (victims statements); Tr. of Sentencing Hr'g, Mar. 22, 2013 ("Tr."), at 7.  The statements describe the substantial adverse effects suffered by individuals whose abuse is filmed and viewed by individuals like defendant. Reported by the victims of child pornography are feelings of ongoing psychological abuse.  As one victim reported, "To think there are pictures being sent all over the country of me is devastating. . . .  In a strange way, the distribution of pictures makes this a crime that never stops."  *Id*.  This and other statements underscore the United States Supreme Court's recognition that child "pornography may haunt [the child] in future years, long after the original misdeed took place."  *New York v. Ferber*, 458 U.S. 747, 759 n.10 (1982) (internal quotation marks and citation omitted; alteration added).

### F.      Sentencing Hearing

Pursuant to the plea agreement, D.M. was sentenced on March 22, 2013 on only Count Four of the Indictment.  Minute Entry, Mar. 22, 2013, ECF No. 40.  Counts One through Three were dismissed.  *Id*.

In advance of the hearing, the parties were directed to "arrange for experts to examine the defendant and relevant materials in this case" to aid the court in fashioning an appropriate sentence for defendant.  *See* Order, Nov. 6, 2012, ECF No. 22.  Among other issues, the court requested that the experts address:

1.   What treatment is defendant now receiving?

2.   What treatment is available in and out of prison and what is recommended?

3. Does defendant pose any danger of acting out?

*Id*. Expert reports were filed by the parties with other submissions at sentencing.

At the sentencing hearing, along with the parties' written submission, testimony was taken from the defendant, his mother, his treating clinicians and the other experts. Oral argument was heard. On the court's suggestion, with the consent of the parties, the treating clinicians and experts were empanelled as a group and engaged in a colloquy among themselves and with the court on the appropriate treatment and sentence for defendant. *See* Part III.A, *infra*; Appendix B, *infra* (transcript of relevant discussion). Adversarial questioning of the treating clinicians and experts was not necessary. They were in agreement on the treatment and sentence needed; defendant does not pose, and is unlikely to pose in the future, a danger of causing harm to a child or anyone else. *See* Part III.B., *infra*.

The sentencing proceeding was videotaped in order to develop an accurate record of the courtroom atmosphere and the factors and considerations that a district court must evaluate in imposing a sentence under 18 U.S.C. § 3553(a). *See In re Sentencing*, 219 F.R.D. 262, 264-65 (E.D.N.Y. 2004) (possible utility on appeal).

## III. Testimony of Treating Therapists and Experts

### A. Expert Testimony at Sentencing Necessary

Congress and the Sentencing Commission have recognized that a district court must consider a wide breadth of information at sentencing. *See Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011). Section 3661 of Title 18 of the United States Code states that *"[n]o limitation* shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider

for the purpose of imposing an appropriate sentence."  18 U.S.C § 3661 (emphasis added).

Pursuant to Section 1B1.4 of the Guidelines, sentencing courts "may consider, *without limitation*, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."  United States Sentencing Commission, Guidelines Manual ("USSG") § 1B1.4 (Nov. 2012) (emphasis added).  These policies embody longstanding practices "under which a sentencing judge could exercise a *wide discretion in the sources and types of evidence* used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law."  *Williams v. New York*, 337 U.S. 241, 246 (1949) (emphasis added).

Particularly useful at sentencing in cases such as the instant one is expert testimony.  The evaluation of experts in the fields of psychology, well-trained on unique issues relevant to sex offenders, can be highly relevant in helping the court determine the effectiveness of a particular sentence.  Judges commonly examine offenders' rehabilitation efforts in determining the likelihood of recidivism and in crafting appropriate sentences.  *See, e.g.*, *United States v. Grober*, 595 F. Supp. 2d 382, 409-12 (D.N.J. 2008) (hearing testimony from mental health experts to aid in sentencing defendant convicted on guilty plea of possession, receipt and distribution of child pornography), *aff'd*, 624 F.3d 592 (3d Cir. 2010); Brenda L. Tofte, *Booker at Seven: Looking Behind Sentencing Decisions: What Is Motivating Judges?,* 65 Ark. L. Rev. 529, 572-73 (2012) ("[W]hen it comes to sentencing, judges look at what offenders have done to rehabilitate themselves when deciding what kinds of sentences to assign.  Accordingly, in the data set . . . sentencing judges were swayed by offenders' rehabilitation efforts almost as much as they were swayed by offenders' family obligations and family support.").  Evidence of a defendant's

efforts at rehabilitation is persuasive.  It is indicative of the likelihood that a defendant will not reoffend and will not cause harm to the public.

Courts should use their "inherent power" to require expert testimony at sentencing.  *See* Fed. R. Evid. 706 Advisory Committee's Note.  The practice of a trial court *sua sponte* seeking expert opinion dates back to common law.  *See generally*, *Hart v. Cmty. Sch. Bd. of Brooklyn, New York Sch. Dist. No. 21*, 383 F. Supp. 699, 762-63 (E.D.N.Y. 1974) ("As early as 1345 a court beckoned surgeons from London to determine if a wound was fresh; cases in 1494 and 1555 reveal courts calling 'masters in grammer' to decipher Latin pleadings."); Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv. L. Rev. 40, 42-43 (1901); George C. Harris, *Testimony for Sale: The Law and Ethics of Snitches and Experts*, 28 Pepp. L. Rev. 1, 34-35 (2000) ("The use of expert witnesses had its origin in two ancient practices.  The first was the use of the 'special jury,' which was composed of people summoned by the court because they were especially qualified by background and knowledge to decide the matter at issue. . . .  Special jurors in the English system provided facts and opinions as well as determining the matter. . . .  From early times, the court also had the power to summon experts to advise the court on factual matters.").

Rule 706 of the Federal Rules of Evidence explicitly endorses the use of court-appointed experts "on [the court's] own motion or on the motion of any party."  Fed. R. of Evid. 706.  The Rule's adoption followed sustained criticism of the predominantly adversarial system for expert witnesses.  *See* Harris*, supra*, at 42 (stating that Wigmore, Hand and other critics "saw the need to unhinge expert testimony from partisan commitment to an adverse party").  As the Advisory Committee's Note to the Rule explains, "The practice of shopping for experts, the venality of

some experts, and the reluctance of many reputable experts to involve themselves in litigation, have been matters of deep concern." Fed. R. Evid. 706 Advisory Committee's Note.

The concerns of Hand, Wigmore, drafters of the Federal Rules of Evidence and others regarding the partisanship of adversary-hired experts remain. *See* Commentary, *Improving Expert Testimony*, 20 U. Rich. L. Rev. 473, 482 (1986) ("An expert can be found to testify to the truth of almost any factual theory, no matter how frivolous, thus validating the case sufficiently to avoid summary judgment and force the matter to trial. At the trial itself an expert's testimony can be used to obfuscate what would otherwise be a simple case. The most tenuous factual bases are sufficient to produce firm opinions to a high degree of 'medical (or other expert) probability' or even of 'certainty.' Juries and judges can be, and sometimes are, misled by the expert for-hire."). These dangers of adversary-hired experts are made plain by comparison to other court systems. *See generally* Marijke Malsch & Ian Freckelton, *Expert Bias and Partisanship: A Comparison Between Australia and the Netherlands*, 11 Psychol. Pub. Pol'y & L. 42, 57 (2005).

The authority to appoint expert witnesses is underutilized in contemporary litigation. *See* Joe S. Cecil & Thomas E. Willging, *Accepting Daubert's Invitation: Defining A Role for Court-Appointed Experts in Assessing Scientific Validity*, 43 Emory L.J. 995, 1003 (1994) (finding that, in a study of over 400 active federal judges, only 20% had appointed an expert on one or more occasions.). Yet, court-appointed experts are associated by judges with positive outcomes:

> The judges who appointed experts were almost unanimous in expressing their satisfaction with the expert: all but two of the sixty-five judges indicated that they were pleased with the services provided. . . . Few judges fail to see any value in appointment of experts by the court. Eighty-seven percent of the judges responding to the question indicated that court-appointed experts are likely to be helpful in at least some circumstances. This openness to appointment of experts

15

extended to judges who had never appointed an expert, 67% of whom indicated that such an appointment might be helpful.

*Id.* at 1008-09.

Inherent in a district court's power to appoint expert witnesses is the related authority to organize the presentation of expert testimony. *See Gates v. United States*, 707 F.2d 1141, 1144 (10th Cir. 1983) (per curiam) (finding no abuse of discretion in trial court's appointment of a panel of experts to assess causation in a case alleging injury due to a flu vaccination); *cf. Hart*, 383 F. Supp. at 764 (construing Federal Rule of Civil Procedure 53, which allows for appointment of a special master, as "broad enough to allow appointment of expert advisors"). A particularly useful tool for receiving expert testimony is through interactive discussion among the experts and the court, similar to how experts might interact when empaneled for discussion at a conference. This practice has been employed with some measure of success in complex mass tort litigation. *See, e.g.*, *In re: Silicone Gel Breast Implant Prod. Liab. Litig.*, No. CV 92-P100000-S, 1996 WL 34401764, at *1 (Aug. 23, 1996) (Pointer, J.) (appointing national committee of experts pursuant to Rule 706); Debra L. Worthington, et al., *Hindsight Bias, Daubert, and the Silicone Breast Implant Litigation*, 8 Psychol. Pub. Pol'y & L. 154, 172 (2002) ("The use of [court-appointed expert] panels has been supported by the scientific, medical and legal community.").

Receiving expert testimony through a panel format promotes reasoned discussion of the relevant issues, allowing the experts to comment on each other's testimony. There is no reason panel discussions by experts should not be utilized in the sentencing context. *See United States v. Shonubi,* 895 F. Supp. 460, 500-11 (E.D.N.Y. 1995) (employing a panel of experts to evaluate statistical evidence relating to drug quantity in a narcotics importation case), *rev'd on other*

16

*grounds*,103 F.3d 1085 (2d Cir. 1997). Through such a technique, areas of consensus or disagreement on technical subject matters are sharply drawn.

The use of court-appointed experts has been subject to some criticism, primarily with respect to fears that such a practice lends experts an "aura of scientific infallibility" in the minds of jurors. *See* M. Neil Browne & Ronda R. Harrison-Spoerl, *Putting Expert Testimony in Its Epistemological Place: What Predictions of Dangerousness in Court Can Teach Us*, 91 Marq. L. Rev. 1119, 1132-37 (2008). However significant this danger may be in some jury cases, it is not present at a non-jury proceeding where the court is imposing a sentence.

Adjudication involves interpreting, applying, modifying and executing the law. Carrying out such tasks without the aid of available and helpful experts could lead to absurd, cruel and dangerous results. The court should not deny itself a tool essential to understanding and organizing a modern society. The work of a district judge is to apply abstract legal principles to real life situations. Specialized knowledge is often essential to this endeavor and should be utilized when needed.

### B.    Unanimous Recommendations of Treating Therapists and Experts for Non-Incarceration

The reports and testimony of defendant's treating therapists and of all of the other experts strongly support their unanimous conclusion that both society and defendant will be best served by a probationary sentence permitting him to continue the intensive outpatient treatment and monitoring that he currently receives. A strong consensus exists among the professionals that defendant is neither a pedophile nor criminal risk to society, and that a sentence of five years' probation, with stringent conditions, is appropriate.

### 1.     Treating Therapists

Almost immediately after a search warrant was executed upon defendant's computers, he began, on his own volition and before being arrested, sex offender treatment under the Krueger-Kaplan Program.  "The program assesses [and provides treatment to] individuals seeking help for a wide range of sexual behaviors, including . . . involvement with child pornography."  Def. Mem., Ex. C at 1.

He received treatment from Dr. Krueger, Dr. Meg S. Kaplan and Dr. Douglas Martinez—well-recognized experts—each of whom submitted reports to aid the court in sentencing and testified at the sentencing hearing.

### a)     Dr. Richard Krueger

Defendant came to the Krueger-Kaplan Program on May 3, 2011, just four days after his computers were searched by agents from the Department of Homeland Security.  Krueger May Rep. 1.  Dr. Krueger, the director of the Krueger-Kaplan Program, conducted an intake interview.  As described by Dr. Krueger, defendant told him: "I'm here because Homeland Security visited my house on Friday morning and they took my computer.  They were looking for child pornography.  *I have had a problem with pornography and need help*."  *Id.* 1 (emphasis added).  Defendant was then accepted into the Krueger-Kaplan program for treatment which he continues to receive today.

Dr. Krueger administered several psychological tests designed to measure defendant's "[d]eviant and [n]on-[d]eviant [s]exual [b]ehavior."  Krueger May Rep. 4-7.  The results of this testing support a conclusion that defendant "makes criteria for a sexual disorder not otherwise specified, or hypersexual disorder, characterized by pornography dependence, and also makes

18

criteria for a paraphilia not otherwise specified, or ephebophilia, which is a dysfunctional sexual interest in teenagers." *Id*. at 10. Dr. Krueger cautions that "this diagnosis has been the subject of considerable controversy, inasmuch as 'normal' adults have significant interest in teenagers and many feel that this does not make criteria for a paraphilic disorder." *Id*.

Notwithstanding defendant's sexual disorders, it is Dr. Krueger's opinion that:

> There is no indication that [defendant] has ever attempted to abuse or actually abused a minor. *His risk of another sexual crime is low according to four actuarial instruments and in our opinion is reduced to remote by virtue of his participation in a treatment.* This risk is certainly such that in our opinion he could resume college and his job. In fact, stable employment (or attendance at school) is one of the major factors associated with reduction of recidivism in the community, and a resumption of work and return to college are some of the major goals of therapy.

*Id*. at 11 (emphasis added). *See also* Def. Mem., Ex. I (Updated Report of Dr. Richard Krueger, Nov. 20, 2012 ("Krueger Nov. Rep."), at 2 ("His contention that he has not abused any minors is supported not only by the absence of any evidence that he has attempted to meet minors, but also by two polygraph examinations, one by a private polygrapher and the other by Homeland Security."). *But see C.R.*, 792 F. Supp. 2d at 430-31 (casting doubt on whether certain risk assessment tools pass muster under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm.*, 509 U.S. 529 (1993)).

Acknowledged by Dr. Krueger at the sentencing hearing was that he is not an "expert" on the types of treatment defendant would receive in a federal prison. Anecdotally, however, Dr. Krueger noted both in his written submission and at the hearing that "it has been [his program's] experience that 3 individuals who passed through our treatment program, who were convicted of charges involving child pornography and sentenced to a minimum of 5 years' incarceration, and who were all highly motivated and requested sexual offender therapy in prison, received

absolutely no sex offender therapy during their stay in prison." Krueger Nov. Rep. 4; *see also* Tr. 20 (stating that many of Dr. Krueger's patients who "have gone into [the] federal system . . . have received no treatment, according to them"). *Cf. C.R.*, 792 F. Supp. 2d at 509 (citing expert testimony that "[a] lengthy prison sentence for [a sex offender] risks a number of . . . deleterious effects, including normalization of criminal behavior and validation of inappropriate feelings towards children"). A period of incarceration, in Dr. Krueger's view, "would disrupt [defendant] from the current treatment program that he's in" and which is "the best situation for his treatment." Tr. 20.

Dr. Krueger testified that defendant has been "extremely compliant, hasn't missed sessions[, and] has been motivated[,] and has made progress." Tr. 19. He views defendant's current treatment plan as critical to his ability to "present[] a remote risk to the public." Krueger Rep. 9. *See also* Tr. 23 ("Dr. Krueger: . . . I think that his risk of [a] contact offense in the nature of a public setting is exceedingly, exceedingly rare."); Krueger Nov. 2012 Rep. (stating that low risk to public is "supported by [defendant's] behavior over the past year and one half, during which he has complied with therapy, resumed his education in college, and has not viewed pornography or child pornography"). Dr. Krueger's professional judgment is that defendant's "risk of recidivism is remote and will be reduced further by virtue of his treatment and can be even reduced further than that by virtue of usual conditions of federal probation which would include ankle monitoring, certain restrictions in his movement[, and] monitoring of his computer at home." Tr. 20. He recommended "perhaps five years" of probation as a sentence because it "would assure some capability of continuing to monitor him to look for any relapses in viewing child pornography." Tr. 21.

### b) Dr. Meg S. Kaplan

Dr. Kaplan, with whom defendant began individual therapy in May 2011, regards him as "*at most a remote risk* to the community of either viewing child pornography or of abusing a child." Kaplan Rep. 1 (emphasis added). It is her judgment that incarceration would result in the loss of his beneficial relationship with therapy. *Id*. She emphasized at the sentencing hearing "how well [defendant] has done in treatment and [that] it would be really important to continue—to be able to continue this treatment as an outpatient. . . . [B]eing in school, socializing with peers . . . is really important for him." Tr. 24.

She notes in her report that:

> [S]tudies have clearly demonstrated that one of the most important factors in reducing the risk of relapse is stable employment, and [defendant], who has developed direction in his life and is again going to college to further his education in graphic design (he is a very talented artist), is on the path to this. *Incarceration would very negatively influence his career aspirations*.

Kaplan Rep. 1 (emphasis added). According to Dr. Kaplan, a period of incarceration would harm the "excellent progress" defendant has made in therapy and "very negatively influence his career aspirations," thereby contributing to the chance of recidivism. *Id*. At the sentencing hearing, she recommended a sentence of five years' probation, agreeing with Dr. Krueger that such a "length of treatment would be sufficient." Tr. 24.

### c) Dr. Douglas Martinez

Defendant began weekly group therapy sessions under the supervision of Dr. Martinez in early 2012. Martinez Rep. 1. Dr. Martinez is a clinical psychologist, with experience treating and assessing the risk of sexual offenders since 1985. *See* Appendix A, *infra* (Dr. Martinez's credentials).

Dr. Martinez's report highlights the critical roles that age, and social and psychological development play in defendant's sexual disorder. It states that:

> [Defendant] is a very immature person who, as a child, discovered pornography. This discovery was in the context of a dysfunctional family, and with a lack of supervision and direction. It was further fueled by the loneliness and frustration of not experiencing social success by being physically isolated. His search for girls on the Internet was consistent with his mental and emotional development. At some point, he realized this was wrong, but not illegal. He denied any interest in prepubescent children. It appears that [defendant] had every little opportunity for appropriate development of reality testing either at home or at school.

> *Regardless of [defendant's] age, this case is more appropriately seen as that of a non-delinquent, naïve youthful offender.* He is not a street-wise teen who flouts authority. He is not a danger to others or to the community. Conversely, he grew up as isolated and socially inept, and as desirous of finding emotional relief. That relief was in the form of video games and pornography viewing, both of which are isolated activities.

> In the process of sex offender treatment, [defendant] has learned the suffering of children who are sexually abused and exploited. *He has also expressed remorse for his behavior in any way that it contributed to this exploitation. He understands not only the illegality of these acts, but the moral wrongness.* He has always taken full responsibility for his behavior.

> . . . .

> At the present time, [defendant] is still quite immature. . . . *It is known that the human brain does not fully mature until the mid-twenties.* This has been documented in articles published by both the American Bar Association and the American Psychological Associations.

> . . . .

> *With regard to incarceration, I do not believe that it will serve the needs of society or [defendant].* First, I can state with a reasonable degree of clinical certainty that *he does not present any risk to the community and does not present a risk of recidivism.*

> Given his naiveté and maturational immaturity, *he is very likely to be exploited if incarcerated.* He does not have the social skills to protect himself, and he is likely to be sufficiently socially inappropriate with others so as to draw negative attention to himself.

A final factor is that one reason why treatment of adolescents results in lower recidivism rates than treatment of adults is that adolescents are malleable. They can respond to treatment, and [defendant] has already evidenced this. . . . [H]e is more capable of change and rehabilitation. [Defendant] is in need of continued offender-specific treatment as well as psychotherapy to develop more mature and positive skills. He does not lack intelligence, and he has shown that he can benefit from outpatient intervention.

*Id*. 4-7 (emphasis added).

### 2. Non-Treating Experts

Three experts in the field of sexual disorders filed reports and appeared at the sentencing hearing. *See* Appendix A, *infra* (experts' credentials). Dr. Cheryl Paradis, a forensic psychologist who submitted a report and testified on behalf of defendant, has no treatment relationship with him. The government's report was authored by Dr. N.G. Berrill, Director of the New York Center for Neuropsychology and Forensic Behavioral Science, and Dr. Jennifer A. McCarthy, Coordinator of the Sex Offender Treatment Program at the same center. Both of the government's experts testified at the sentencing hearing.

All of the experts agreed that defendant is not a pedophile and not a danger to the community. They further agree on the desirability of continued sex offender treatment and a non-incarceratory sentence of five years' probation.

### a) Dr. Cheryl Paridis

Dr. Paridis, defendant's well-recognized expert describes defendant "as an immature and lonely young man." Def. Mem., Ex. E (Report of Cheryl Paridis, Oct. 15, 2012 ("Paridis Oct. 2012 Rep.")). Although "[h]is ability for self reflection is limited," she reports that "this is an area he is addressing in his individual psychotherapy." *Id*. at 10. A silver lining of any

"maladaptive personality traits" is that they "actually serve as a deterrent to reoffending." *Id*. at 11.

Concluded by Dr. Paridis is that "[defendant] has not demonstrated a propensity to act upon his fantasies" or to reoffend. *Id*. On this point, she states in her report that:

> [Defendant] does not have some of the major weaknesses associated with greater risk of reoffense. He does not have symptoms of major mental illness, nor does he have any problems with substance abuse. Another important factor to support the conclusion that he is of low risk of reoffense is that he also has no prior criminal history.
>
> Another positive factor to consider in determining [defendant's] risk of future offending is his strong sexual attraction to women. Testing by Dr. Krueger, and the defendant's own comments, indicate that he can be sexually fulfilled through relationships with women or through adult pornography.
>
> Perhaps the strongest indication that [defendant] is at low risk of reoffending is that he is very motivated to change his behavior. He has attended sex offender treatment since his arrest on the instant offense. He told me that he finds psychotherapy very helpful and plans to continue in treatment. . . .
>
> In addition to the positive factors described above, [defendant] has very supportive family and friends. He has career aspirations that are realistic and achievable. These factors will be of great weight in his future ability to create a more fulfilling life and avoid future criminal behavior.
>
> *In my opinion [defendant] will benefit from continuing in the intensive specialized treatment program he currently attends*.

*Id*. at 11-12 (emphasis added). *See also* Def. Mem., Ex. K (Supplemental Report of Cheryl Paridis, Nov. 29, 2012), at 2 ("There are several indications to suggest that [defendant]is at low risk of committing future sex offenses.").

As to an appropriate sentence for defendant, Dr. Paridis testified at the sentencing hearing that she "think[s] the idea of probation where he's being monitored for five years is a good idea,

that he maintain a relationship with his therapy is a good idea, [and that he] continue going to school and college is very important." Tr. 25.

### b) Dr. N.G. Berrill and Dr. Jennifer A. McCarthy

The government's experts, Dr. Berill and Dr. McCarthy, who are well-recognized in their fields, reported: "[defendant] impresses as an emotionally and sexually immature individual," who "has essentially relied on the use of pornography (which he began viewing at an early age) to satisfy his sexual needs." *See* Gov't Mem., Ex. A ("Berill & McCarthy Rep."), at 21. They "highly recommend[] that [defendant] continue to participate in sex offender treatment (both individual and group) to explore the motivating factors that led to his offense; and to address issues related to intimacy deficits, emotional self-regulation, and sexual self-regulation." *Id.* at 21-22.

At the sentencing hearing, Dr. Berrill testified that he is "sure that [defendant] can be adequately treated and monitored on probation." Tr. 26. Firmly declared by Dr. Berrill was that a period of five years of probation would be sufficient because "if [defendant is] going to relapse one would guess that during that interim there would be evidence of that." Tr. 26.

Dr. McCarthy, the last expert to testify at the hearing, stated as follows with respect to an appropriate sentence for defendant:

> I basically concur with everything the other doctors have said. I think [a five year term of probation is] good. He seems to have social support. He seems to have family support. It's good that he will continue to attend college. Again, I concur. He definitely needs continuing treatment and he's established[,] it seems[,] like a healthy relationship with his therapists and they are working on his treatment. So I concur with everybody.

Tr. 27.

**IV.     Sentencing Law**

The Supreme Court's rulings in *United States v. Booker*, 543 U.S. 220 (2005), and its progeny appropriately recognize that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc), *cert. denied*, 129 S. Ct. 2735 (2009). It is the sentencing court that "is in the best position to judge the appropriateness of a sentencing departure in light of the defendant's overall history and character, his remorse or lack of it, and other factors bearing on the sentence to be imposed." *United States v. Crowley*, 318 F.3d 401, 421 (2d Cir. 2003).

Even though the mandatory nature of the Guidelines has been eliminated and they are now "advisory" only, *see Booker*, 543 U.S. at 245-46, they must be given "respectful consideration" by the sentencing court, *Kimbrough*, 552 U.S. at 101. The Guidelines range still serves as "the starting point and the initial benchmark" for all sentencing proceedings. *See Gall*, 552 U.S. at 49. This is so because the Guidelines, which are promulgated by the United States Sentencing Commission, are presumed, to various degrees, to be "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46.

In addition to the Guidelines, the "statutory concerns" of 18 U.S.C. § 3553(a) must be considered. *Kimbrough*, 552 U.S. at 87; *accord Pepper*, 131 S. Ct. at 1241 ("Our post-*Booker* opinions make clear that, although a sentencing court must 'give respectful consideration to the Guidelines, *Booker* permits the court to tailor the sentence in light of other statutory concerns as well.'") (quoting *Kimbrough*, 552 U.S. at 101); *Kimbrough*, 552 U.S. at 113 (Scalia, J.,

concurring) ("[T]he district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines.").  Those concerns are commonly referred to as the "§ 3553(a) factors," which include the following:

>(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>(2) the need for the sentence imposed—
>
>>(A) to reflect the seriousness of the offense, to promote respect for the law; and to provide just punishment for the offense;
>>
>>(B) to afford adequate deterrence to criminal conduct;
>>
>>(C) to protect the public from further crimes of the defendant; and
>>
>>(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
>(3) the kinds of sentences available;
>
>(4) the kinds of sentence and the sentencing range established [by the Guidelines;] . . . .
>
>(5) any pertinent policy statements [issued by the Sentencing Commission;] . . . .
>
>(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
>(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  The court "should consider all of 18 U.S.C. § 3553(a)'s factors," *Gall*, 552 U.S. at 49-50, in issuing a sentence that is "sufficient, but not greater than necessary, to comply

with the purposes" of sentencing. 18 U.S.C. § 3553(a). These factors are considered in detail in Part V.B, *infra*.

While no longer mandatory, the court must take note of 18 U.S.C. § 3553(b)(2). *See United States v. Selioutsky*, 409 F.3d 114, 116-17 (2d Cir. 2005) (considering the excising of § 3553(b)(2) under the rationale set forth in *Booker*). It directs district courts to upwardly depart from the Guidelines for crimes involving children and sex offenses *if* "there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence greater than that described." 18 U.S.C. § 3553(b)(2). Section 5K2.0(a)(1)(B) of the Guidelines expresses the same preference. *See* USSG § 5K2.0(a)(1)(B). No such consideration warranting an upward departure is manifested in the instant case.

A sentencing court may also impose a non-Guidelines sentence based on its disagreement with a particular policy reflected in the Guidelines. *See Spears v. United States*, 555 U.S. 261, 264 (2009) (stating that "the point of *Kimbrough*" was to "recogni[ze] [the] district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case") (emphasis in original). This authority "is at its greatest when the offense Guideline at issue is not the product of the Commission's empirical analysis and technical expertise." *United States v. Diaz*, No. 11-CR-821, 2013 WL 322243, at *3 (E.D.N.Y. Jan. 28, 2013) (Gleeson, J.). It has been recognized explicitly by the Court of Appeals for the Second Circuit with respect to the child pornography Guidelines. *See Dorvee*, 616 F.3d at 188. In the

instant case, the court does not rely on any power it has to disagree with any sentencing policy reflected in the Guidelines, but bases its decision on relevant statutes.

The specific reasons for any sentence imposed must be "state[d] in open court." 18 U.S.C. § 3553(c). It is required that a departure from the Guidelines be explained in writing. *See Rita v. United States*, 551 U.S. 338, 356 (2007) ("[A] statement of reasons is important. The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority"); *Cavera*, 550 F.3d at 190 ("[A] district court errs if it fails adequately to explain its chosen sentence, and must include an explanation for any deviation from the Guidelines range.") (internal citations and quotation marks omitted).

## V.     Application of Law to Facts

### A.     Guidelines Calculation

The recommended Guidelines sentence was calculated on the record at the sentencing hearing. *See* Tr. 12. The defendant's total offense level is twenty-eight and his criminal history is I (no prior criminal conduct), yielding a guidelines range of imprisonment between seventy-eight and ninety-seven months.

The total offense level reflects a series of enhancements for the following characteristics: two points because the material at issue included photographs of minors under the age of twelve, U.S.S.G. § 2G2.2(b)(1); four points because the materials included images and videos portraying "sadistic or masochistic conduct or other depictions of violence," *id.* § 2G2.2(b)(4); two points for the "use of a computer or an interactive computer service for the possession . . . of the material, or for accessing with intent to view the material," *id.* § 2G2.2(b)(6); and five points

because the offense involved the possession of "600 or more images," *id*. § 2G2.2(b)(7)(D).

These enhancements convert this case, involving a physically non-dangerous defendant, into one, for purposes of the Guidelines, pertaining to highly aggravated physical criminal conduct. *See Dorvee*, 616 F.3d at 186 (reporting United States Sentencing Commission statistics showing that, in 2009, "94.8% of child pornography sentences involved an image of a prepubescent minor (qualifying for a two-level increase pursuant to § 2G2.2(b)), 73.4% involved an image depicting sadistic or masochistic conduct or other forms of violence (qualifying for a four-level enhancement pursuant to § 2G2.2(b)(4)), and 63.1% involved 600 or more images (qualifying for a five-level enhancement pursuant to § 2G2.2(b)(7)(D))"); *C.R.*, 792 F. Supp. 2d at 513 ("Use of a computer, which enhances a defendant's sentence, fails to distinguish dangerous commercial distributors of online pornography from more passive users such as defendant." (citing *Dorvee*, 604 F.3d at 95-96)). The calculation also reflects a three-point downward adjustment for defendant's acceptance of responsibility. *See* USSG § 3E1.1(a)-(b).

The top end of this range—ninety-seven months—is twenty-one months shy of the maximum term of one-hundred and twenty months provided by the statute. 18 U.S.C. § 2252(b)(2). Absent a three-point downward adjustment for accepting responsibility, defendant's offense level would be 31, yielding a range of 108-135 months of imprisonment—a range that would contemplate defendant's receiving a sentence in excess of the maximum sentence permitted by the criminal statute he violated.

The criminal statute prohibiting possession of child pornography permits a maximum fine of $250,000. 18 U.S.C. § 3571(b)(3). The calculated Guidelines yield a recommended fine

range of $15,000 to $150,000.  *See* USSG § 5E1.2(c)(3).  A special assessment of at least $100 is mandatory.  18 U.S.C. § 3013.

If a term of imprisonment were imposed, a supervised release term ranging from two years to life would have been required under the applicable statute.  18 U.S.C. § 3583(k).  The Guidelines would have required the same term of supervised release following any term of imprisonment.  *See* USSG §§ 5D1.1(a), 5D1.2(a)(2), and 5D1.2(b)(2).  Because the instant offense is a conviction for a sex crime, the Guidelines recommend a statutory maximum term— here, a life term—of supervised release.  *See id.* § 5D1.2.

While defendant is ineligible for probation under the Guidelines, *see id.* § 5B1.1(a), the statute which he violated permits a term of probation of between one and five years.  18 U.S.C. § 2561(c)(1).

### B.      Section 3553(a) Factors

As described below, an individualized assessment of the § 3353(a) factors strongly supports a sentence that departs from the calculated Guidelines' range.

### 1.      Sufficient But Not Greater Than Necessary

The fundamental rule for federal sentencing is that it shall result in "a sentence sufficient, but not greater than necessary, to comply" with the requirements of the § 3553(a) factors.  18 U.S.C. § 3553(a)(2).  The court's consideration of each of those factors is described in Parts V.B.2-9, *infra*.

### 2.      Nature and Circumstances of the Offense; History and Characteristics of the Defendant

The offense to which D.M. pled guilty is a serious one.  Criminal conduct such as his supports a market that preys upon and imposes serious harm onto children.  *See* Gov't Mem. 8

31

(citing *United States v. Sherman*, 268 F.3d 539, 545, 547 (7th Cir. 2001) & *United States v. Shutic*, 274 F.3d 1123, 1126 (7th Cir. 2001)).  Child abuse by individuals other than defendant occurred in order for him to commit this crime.  Continued emotional violence is visited upon the victims of child pornography by the knowledge that their abuse is being viewed and consumed by individuals like defendant.  *See* Part II.E, *supra* (victim impact).

Defendant was born in Brooklyn, New York and has resided there his entire life.  PSR ¶¶ 29-30.  At an early age, his parents divorced and, for the most part, defendant has had only a limited relationship with his father.  Addendum to PSR 1 (Nov. 6, 2012) 1.  He developed an obsession with child pornography at a young and impressionable age.  He first was exposed to child pornography—"a picture of a naked prepubescent girl, approximately age 11"—when he was 13 or 14 by a friend from school.  PSR ¶ 13; Second Addendum to PSR.  At the age of fourteen, he began looking at child pornography persistently.  *See* Krueger May Rep. 3.  This element of defendant's offense is critical:  "[f]ederal courts have emphasized the fundamental difference between the conduct of an immature defendant whose child pornography habit began in adolescence and others whose conduct began as an adult."  *C.R.*, 792 F. Supp. 2d at 514-15 (citing cases).  *See also id*. at 515 ("[Defendant's] continued viewing of child pornography on file sharing networks during his teenage years must be balanced against mental health evaluations that indicate C.R. is 'grossly naïve and immature;' scientific research explaining that pre-frontal lobe development, the part of his brain that manages impulse control, judgment, and decision making, persists until the mid-twenties; lack of any effective steps by his parents to control or have C.R. treated for his emotional problems; and creation by his adult custodians of an unhealthy sexual atmosphere bound to exacerbate the sexual problems of this adolescent.").

Post-arrest conduct is relevant. No father figure was present in defendant's life when his obsession with child pornography began; two of defendant's uncles have since demonstrated a meaningful interest in his development. Tr. 41. Treatment for defendant's disorder began only *after* he was arrested. Defendant is now fully cognizant of the adverse effect "that [child pornographic] video and images have on the child victims that are being exploited." Tr. 39. *See also id*. at 40 ("The Defendant: . . . I have not taken anything that has transpired in the last two years for granted."). Sincere remorse was expressed by defendant at sentencing. Tr. 36-37 ("The Defendant: . . . I'm here today to accept full responsibility for my actions."). A high school graduate, defendant is currently enrolled, and excelling, at a college-level art school. PSR ¶ 48.

Defendant's history and characteristics support a probationary sentence.

### 3. Reflect the Purposes of Sentencing

The sentence imposed must comply with the goals of punishment outlined in 18 U.S.C. § 3553(a)(2). These goals are for the punishment imposed to: reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C § 3553(a)(2).

A non-incarceratory sentence, along with a broad array of probationary restrictions and a lifetime of collateral consequences, reflects the seriousness of the offense, promotes respect for the law and provides just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). *See also Lawrence v. Texas*, 539 U.S. 558, 575 (2003) (recognizing that the "stigma" imposed for violation of sex

crime statute "is not trivial"); *United States v. Mateo*, 299 F. Supp. 2d 201, 209-10 (S.D.N.Y. 2004) ("[B]eyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement.").

There are two major aspects to deterrence: general and specific. *See* 18 U.S.C. § 3553(a)(2)(B). General deterrence is satisfied by a non-incarceratory sentence that carries with it punitive conditions. While it is recognized that defendant's conviction will deter some from engaging in the crime he committed, the compulsive behavior and disorders motivating many offenders is less susceptible to general deterrence, but can be dealt with by the close probationary supervision and conditions imposed that will deter others.

Specific deterrence is achieved through treatment and supervision, extensive probationary conditions, and a host of collateral consequences which defendant will face for the rest of his life. *See, e.g.*, 42 U.S.C. §§ 16911, 16915(a)(1) (fifteen years of supervision for lowest risk federal offenders); § 16915(b) (possibility of early termination of supervision for federal offenders after ten years); N.Y. Corr. Law § 168–h(1) (twenty years of supervision for lowest risk offender). It is unlikely that this defendant will engage in further criminal activity in light of his supportive family, sincere expression of remorse, and other positive indicia

The likelihood that defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." *Pepper*, 131 S. Ct. at 1242; 18 U.S.C. § 3553(a)(2)(C). Credible evidence proves above the clear and convincing level—and, in effect,

meets a reasonable doubt standard—that defendant has never attempted to physically abuse or actually physically abused a minor and that he is unlikely to do so if his current course of treatment continues. *See* Part III.B, *supra*. His risk of committing another sexual crime is miniscule; it will remain "remote" as a result of continued participation in outpatient individual and group therapy. *Id.* Dr. Kaplan, who serves as D.M.'s individual therapist, "advise[s] that [he] has been fully cooperative with his treatment, has been highly motivated and has made good progress." PSR ¶ 41. The group therapist, Dr. Martinez, shares that view. *Id.* ¶ 43. Integration with society, including attaining stable employment and attending art school, is significantly associated with reducing the chance that defendant will ever act out again. *See* Part III.B, *supra*.

A non-incarceratory sentence with mandatory outpatient treatment will best preserve the success achieved by defendant with his current therapists. 18 U.S.C. § 3553(a)(2)(D). Since beginning counseling following his arrest, defendant has experienced significant improvement in his mental and emotional conditions. *See* Part III.B, *supra*. Therapeutic relationships with eminent specialists in the field of sex therapy have produced positive results. Real progress has been achieved: defendant is immersed in his studies and becoming socially adept at interacting with his peers. *See, e.g.*, Tr. 39 ("The Defendant: . . . Being at [art school] has given me purpose to get up each morning and put me on a career path I know I can be successful in."). There exists a credible and significant risk that a prison sentence will increase defendant's antisocial disabilities and his risk to the public. *See* Part III.B, *supra*. *See also C.R.*, 792 F. Supp. 2d at 516 (stating that "[i]nmates who are known to be sex offenders are often viciously preyed upon by other inmates").

Defendant is capable of a useful and productive life if provided adequate treatment, supervision and control. Building upon the therapeutic achievements attained since his arrest will help "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B). *See also C.R.*, 792 F. Supp. 2d at 517 (stating that "[s]tudies suggest that youth are more amenable to treatment than adults and that recidivism is low for youthful sex offenders") (citing Stephanie Holmes, An Empirical Analysis of Registration and Notification Laws for Juvenile Sex Offenders *9 (May 1, 2009), *available at* SSRN: http://ssrn.com/abstract=1710745. *Cf. United States v. Cossey*, 632 F.3d 82, 88 (2d Cir. 2011) (finding district court committed plain error to the extent "decision of recidivism [was based] on its unsupported theory of genetics").

### 4. Kinds of Sentences Available and Sentencing Range Established

Sentences actually imposed in similar cases have been considered, as required by § 3553(a)(3)-(4). The sentencing options available to the court include permutations of the following variables: custody followed by supervised release; probation; restitution; forfeiture; and fines. An additional variable of critical importance is the availability of sex offender treatment. If a term of incarceration were imposed, defendant would be eligible to voluntarily enroll in a nonresidential sex offender treatment program, but only if the sentence is at least eighteen months. *See* Gov't. Mem. 4. Participation in a nonresidential program is not mandatory; defendant must agree to enroll. *Id.* Even then, the programs, which are available at five institutions across the United States (located in Arizona, Florida, Illinois, Texas, and Virginia), ordinarily involve six to eight hours of programming per week over a nine to twelve month period. *Id.* Defendant would not be ineligible for an intensive, residential sex offender program, which are designed for higher risk offenders. *Id.*

Under a probationary sentence, sex offender treatment can be made mandatory. It can be required immediately and for a period longer than the nine to twelve months of treatment defendant would be eligible for in prison. With this fact in mind, viable sentencing options essentially include a prison term of sufficient length to allow for defendant to enroll in, and complete, nine to twelve months of sex offender treatment while incarcerated or a probationary sentence of up to five years in length with mandatory outpatient mental health and sex offender treatment.

Testimony from defendant's therapists and the experts is unanimous that defendant should continue to participate in sex offender treatment (individual and group) outside of prison. *See* Part III.B, *supra*. Given the substantial progress defendant has shown with his current outpatient treatment, the lack of risk he presents to the public, and the importance of immersing himself in an environment of his peers, a sentence of non-incarceratory probation is more appropriate in this case than any other. In the view of the professional judgment of the therapists and experts, custody would not provide defendant with sufficient treatment.

### 5. Guidelines, Policy, and Other Criteria of the Sentencing Commission

Serious consideration and weight has been given to Sentencing Commission materials. 18 U.S.C. § 3553(a)(5). As discussed at further length *infra*, Part V.C, the Commission itself has reservations about the long sentences required in child pornography cases. Despite the Guidelines' policy statement to the contrary, *see* USSG § 5K2.0, p.s., recent reports and statements issued by the Sentencing Commission lend support for a sentence that departs from the recommended Guidelines sentence.

## 6. Avoid Unwarranted Sentence Disparities

Comparable sentences have been analyzed as required under 18 U.S.C. § 3553(a)(6). While it is not difficult to find cases where severe sentences within and above the Guidelines have been imposed, there is by no means a paucity of cases where judges downwardly depart from the Guidelines. The unreasonable harshness of the Guidelines for an offense of child pornography possession, of which defendant is charged, has been recognized by courts and judges from across the country. *See, e.g., United States v. Pulsifer*, 469 Fed. App'x 41, 44 (2d Cir. 2012) (describing the "unusually harsh impact of the child pornography Guidelines"); *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) (expressing the "view that the sentencing guidelines [for child pornography] are in our judgment harsher than necessary"); *United States v. Henderson*, 649 F.3d 955, 964 (9th Cir. 2011) (Berzon, J., concurring) (describing the "unjust and sometimes bizarre results" that follow from application of the child pornography Guidelines); Jelani Jefferson Exum, *What's Happening with Child Pornography Sentencing?*, 24 Fed. Sent'g Rep. 85, 89 (2011) ("growing consensus among district court judges and the broader legal community that federal sentences for possession of child pornography are too harsh"); U.S. Sent'g Comm., Results of Survey of U.S. Dist. Judges, Jan. 2010 through Mar. 2010, Question 8 (June 2010) (finding that 70% of United States District Judges believe Guideline range for child pornography possession is too high and 69% of United States District Judges believe range for child pornography receipt is too high). Sentences imposing no or very little incarceration are not unheard of for offenders convicted only of possessing child pornography. *See, e.g.*, *United States v. Autery*, 555 F.3d 864 (9th Cir. 2010) (affirming non-Guidelines sentence of five years of probation and no period of incarceration for possession of child pornography); *United States*

*v. Stall*, 581 F.3d 276 (6th Cir. 2009) (affirming non-Guidelines sentence of one day of incarceration followed by ten-year period of supervised release); *United States v. Prisel*, 316 Fed. App'x 377 (6th Cir. 2008) (affirming non-Guidelines sentence of one day in prison followed by eighteen months of home confinement for possession of child pornography); *United States v. Rowan*, 530 F.3d 379 (5th Cir. 2008) (affirming non-Guidelines sentence of five years of probation and no period of incarceration for possession of child pornography); *United States v. Polito*, 215 Fed. App'x 354 (5th Cir. 2007) (per curium) (affirming non-Guidelines sentence of five years of probation with one year of house arrest for possession of child pornography); *United States v. Diaz*, 720 F. Supp. 2d 1039 (E.D. Wis. 2010) (imposing non-Guidelines sentence of six months of incarceration followed by twelve years' supervised release); *United States v. Meillier*, 650 F. Supp. 2d 887 (D. Minn. 2009) (imposing non-Guidelines sentence of one day of confinement followed by thirty years of supervised release); *United States v. Boyden*, No. 06-CR-20243, 2007 WL 1725402, at *10 (E.D. Mich. June 14, 2007) (imposing non-Guidelines sentence of one day of confinement followed by three years of supervised release, the first year of which to be served in a community correctional facility); *United States v. Evren*, No. 10-CR-131-JG (E.D.N.Y. Feb. 26, 2013), ECF No. 59 (imposing non-Guidelines sentence of three years of probation for defendant who pleaded guilty to one count of possession of child pornography). *See also United States v. Morace*, 594 F.3d 340, 351 n.10 (4th Cir. 2010) (noting "that some district courts have begun sentencing defendants convicted of possessing child pornography to one day of incarceration followed by a term of supervised release"); U.S. Sentencing Comm'n, Report to the Congress: Federal Child Pornography Offenses 7 (Dec. 2012) ("Comm'n Rep. on Fed. Child Pornography Offenses") ("[D]efendants sentenced under the non-

production child pornography guidelines have received sentences outside of the applicable guidelines more frequently than defendants in all other major types of federal criminal cases."); *id*. at 130 (all child pornography defendants sentenced to probation in fiscal year 2010 were convicted of possession only). *But cf. United States v. Pugh*, 515 F.3d 1179, 1192 (11th Cir. 2008) (finding even a sentence of five years of probation for possession of child pornography substantively unreasonably low for first time offender who presented low risk of recidivism and had never physically harmed a child).

Any lack of uniformity between the sentence imposed here and sentences in other cases for the same offense is a product of this court's individualized assessment of the defendant. *See, e.g.*, Part III.B, *supra* (discussing several factors that differentiate defendant from typical child pornography offenders). To the extent "*unwarranted* sentence disparities" need be avoided, that value should not be given undue weight. *See Pepper*, 131 S. Ct. at 1249 (rejecting the "invitation" to elevate § 3553(a)(6) "above all other[]" sentencing factors).

### 7. Provide Restitution

Restitution is not sought by the government and is not needed in this case. 18 U.S.C. § 3553(a)(7). No showing has been made that any harm suffered by a child was proximately caused by defendant's possession and viewing of child pornography. *See United States v. Aumais*, 656 F.3d 147, 152-55 (2d Cir. 2011) (restitution limited to losses proximately caused by defendant's conduct).

### C. Public Policy

Serious consideration of the factors listed in § 3553(a) counsels in favor of departing from the calculated Guidelines' range. It might be argued, though it is only assumed here, that

the Guidelines' suggestion of a long incarceratory sentence in this case should not be followed for policy reasons. The authority to disregard the Guidelines for child pornography offenses on policy grounds has been recognized by the Court of Appeals for the Second Circuit. *See Dorvee*, 616 F.3d at 188.

Acknowledged by many is that the child pornography Guidelines are based, not on the Commission's empirical approach, but on a series of congressional directives. *See, e.g.*, *Dorvee*, 616 F.3d at 184; *United States v. Munoz*, Crim. No. 11-167 (JRT/AJB), 2012 WL 5351750, at *4 n.2 (D. Minn. Oct. 30, 2012) (citing several federal appellate and district courts which "have determined that the Guidelines in child pornography cases are . . . 'largely the product of congressional directives, some of which the Sentencing Commission actively opposed, rather than Commission study and expertise.'" (quoting *Diaz*, 720 F. Supp. 2d at 1042)); William K. Sessions III, *Thomas E. Fairchild Lecture Federal Sentencing Policy: Changes Since the Sentencing Reform Act of 1984 and the Evolving Role of the United States Sentencing Commission,* 12 Wis. L. Rev. 85, 103-04 (2012) (noting that the PROTECT Act, directing specific changes to child pornography guidelines, "marked a dramatic change in the nature of directives to the Commission" and "meant the Commission could not conduct rigorous empirical research before amending the guidelines . . . [or] . . . ensure that the changes were consistent with other guidelines"). This has resulted, over a span of thirty years, in an expansive transformation of the child pornography Guidelines.

The genesis of the current iteration of the Guidelines for child pornography offenders— embodied in USSG § 2G2.2—has been well-articulated by this and other courts, as well as by practitioners and academics. *See, e.g.*, *Dorvee*, 616 F.3d at 184-88; *C.R.*, 792 F. Supp. 2d at 478-

80; Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (2009), *available at* http://www.fd.org/docs/Select-Topics---sentencing/child-porn-july-revision.pdf.

At their inception, in 1987, the Guidelines for child pornography covered only the crimes of transporting, receiving, and trafficking offenses. *See C.R.*,792 F. Supp. 2d at 478. Possession of child pornography was not then a federal crime. *Id*. But, as Harvard Law School professor Carol S. Streiker has recognized:

> [T]he treatment of child pornography has been a one-way ratchet, repeatedly turned by Congress. In a little more than two decades, the child pornography Guidelines were substantively revised nine times, with each revision either extending the scope of the offense or making the penalty harsher. In the span of a single decade (from 1997 to 2007), the mean sentence of child pornography offenders increased from 20.59- months to 91.30-months confinement—an increase of 443%. Every legislative tool in the congressional toolkit was employed: Congress created new crimes, imposed mandatory minimum sentences, issued directives to the Commission to increase sentences under the Guidelines, and even bypassed the Commission.

Carol S. Streiker*, Lessons from Two Failures: Sentencing for Cocaine and Child Pornography under the Federal Sentencing Guidelines in the United States*, 76 Law & Contemp. Probs. 27, 37 (2013).

While no sentence for possession of child pornography was even contemplated by the Guidelines at their inception, today the Guidelines include a *base* offense level of eighteen for a possession offense, translating into a recommended sentence ranging from twenty-seven to thirty-three months for an offender with the lowest criminal history category. *See Dorvee*, 616 F.3d at 184-85. The recommended Guidelines sentence for a non-production child pornography offense, however, is almost never based solely on a base offense level, but is increased by other factors. *See* Part V.A, *supra*.

The Sentencing Commission recently explained the near-universal application of base level "enhancements" to child pornography offenses, which exacerbate the extremely unfair nature of the Guidelines:

> Non-production child pornography offenses have become almost exclusively Internet-enabled crimes; the typical offender today uses modern Internet-based technologies such as peer-to-peer ("P2P") file-sharing programs that were just emerging only a decade ago and that now facilitate large collections of child pornography. The typical offender's collection not only has grown in volume but also contains a wide variety of graphic sexual images (including images of very young victims), which are now readily available on the Internet. As a result, four of the six sentencing enhancements in § 2G2.2—those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 levels—now apply to most offenders and, thus, fail to differentiate among offenders in terms of their culpability. These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders. Indeed, most of the enhancements in § 2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained child pornography in printed form in the mail.

Comm'n Rep. on Fed. Child Pornography Offenses ii-iii. The routine addition of these enhancement levels to the base level offense for possession of child pornography produces an offense level of thirty-three. For an offender in the lowest criminal history category, that offense level translates into a recommended sentence of 135-168 months. *See* USSG Sentencing Table.

The demonstrated range of culpability involved in child pornography offenses is unaccounted for by the Guidelines. Solely for the conduct at issue in this case—i.e., possessing child pornography by means of a peer-to-peer file sharing program—a defendant could receive a longer Guidelines sentence than the sentence imposed upon "[a]n adult who intentionally seeks out and contacts a twelve year-old on the internet, convinces the child to meet and to cross state lines for the meeting, and then engages in repeated sex with the child." *Dorvee*, 616 F.3d at 187. The former conduct may result in a Guidelines range of up to 210 months in prison; the latter

43

conduct—which is far more egregious—may result in a Guidelines range of 151 to 188 months in prison. *Id*. at 186-87. Put differently, "an individual who, sitting alone, obtained images of sexually exploited children on his computer, could receive a higher sentence than the Guidelines would recommend for an offender who actually rapes a child." *United States Cruikshank*, 667 F. Supp. 2d 697, 702 (S.D. W. Va. 2009). Where the crime of possessing child pornography is committed by a first-time offender, such as this defendant, who has never physically harmed a child and is unanimously deemed by credible experts not to present a risk of harming a child in the future, the foregoing hypotheticals make obvious the needless severity of the child pornography Guidelines.

The Court of Appeals for the First, Second, Third and Ninth Circuits—as well as district courts—have expressly recognized what little deference the child pornography Guidelines are owed. *See Dorvee*, 616 F.3d at 188; *Henderson*, 649 F.3d at 960 (holding that "district judges must enjoy the same liberty to depart from [the child pornography guideline] based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough*); *United States v. Grober*, 624 F.3d 592, 609 (3d Cir. 2010) (affirming district court's decision based on policy disagreement not to apply recommended Guidelines range for child pornography offense); *Stone*, 575 F.3d at 93 (recognizing district court's authority to vary from child pornography Guidelines); *Munoz*, 2012 WL 5351750, at *4 n.2 (citing cases); *see also United States v. Huffstatler*, 571 F.3d 620, 623 (7th Cir. 2009) (per curiam) ("[W]hile district courts perhaps have the freedom to sentence below the child-pornography guidelines based on disagreement with the guidelines, as with the crack guidelines, they are certainly not required to do so."). *But see, e.g.*, *United States v. Miller*, 665 F.3d 114, 121 (5th Cir. 2011)

44

("[W]e will not reject a Guidelines provision as 'unreasonable' or 'irrational' simply because it is not based on empirical data and even if it leads to some disparities in sentencing.").

Widespread criticism from the judiciary and others supports the Sentencing Commission's recent proclamation that it "concurs with the many stakeholders who contend that *the sentencing scheme should be revised* to better reflect both technological changes in offense conduct and emerging social science research and also better account for the variations in offenders' culpability and their sexual dangerousness."  Comm'n Rep. on Fed. Child Pornography Offenses 15 (emphasis added).  Action must be taken, argues the Commission, to ensure that the Guidelines more rationally "account for recent technological changes in offense conduct and emerging social science research about offenders' behaviors and histories, and also to better promote the purpose of punishment by accounting for the variations in offenders' culpability and sexual dangerousness."  *Id*. at xvii.

The United States Department of Justice "has joined the call for a critical review of the existing sentencing guidelines for non-production child pornography."  *See* Letter from Anne Gannon, Nat'l Coordinator for Child Exploitation Prevention and Interdiction, Office of the Deputy Attorney General, U.S. Dep't. of Justice, to Honorable Patti B. Saris, Chair, U.S. Sentencing Comm'n (Mar. 5, 2013).

Rationales for child pornography Guidelines for non-production offenses have been shredded.  While it is unnecessary now to categorically reject their further application, the failure to apply them in the instant case is supported by concerns expressed by intermediate appellate courts, district courts, the Sentencing Commission, the United States Department of Justice and others.  It is recognized that the child pornography Guidelines are "fundamentally different from

45

most and . . . , unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Dorvee*, 616 F.3d at 184. Acceptance of this fact enhances a sentencing court's ability to properly comply with its duty to impose sentences that reflect the statutory goals of sentencing and are based on a required individualized assessment of the facts presented.

### D. Sentence Imposed

Requested by the government is "a sentence near or within the advisory Guidelines range." Gov't Mem. 5. Defendant requests a probationary sentence. Def. Mem. 20-22.

A sentence of five years' probation is imposed. The following conditions will apply during defendant's term of probation: participation in a mental health treatment program for sexual disorders; a ban on cohabitation with any child under the age of eighteen unless approved by the court's Probation Department; a ban on associating with children under the age of eighteen without prior approval from Probation, with an exception for situations at work and school where he would encounter juveniles as a matter of due course; a requirement that, if he cohabitates with an individual who has minor children, defendant informs his partner of his prior criminal history and the ban on associating with children under the age of eighteen; compliance with sex offender registration requirements mandated by law; a ban on the use of a computer or Internet capable device to access pornography of any kind; cooperation with limitations by Probation's Computer and Internet Monitoring Program to the extent that it does not interfere with his studies or employment; a ban on the possession of a firearm, ammunition or any other destructive device; periodic polygraph testing; and submission by defendant of his person, residence, place of business, vehicle or any premises under his control to a search when a

Probation officer has a reasonable belief that contraband or evidence of a violation of the conditions of release may be found. *See* Tr. 30-32.

A $100 special assessment was ordered. No fines were imposed because the defendant does not have any assets, and it is unlikely that he will have any in the future, to pay a fine. Because no restitution was requested, none is ordered. Property seized at the time of defendant's arrest which depicts child pornography is ordered forfeited.

## VI.    Conclusion

Following an analysis of the Guidelines, the statutory criteria for sentencing defendant under § 3553(a), and consideration of accepted goals in sentencing for the crime to which defendant has pled guilty, a sentence of five years' of strictly supervised probation is imposed. Defendant must meet all of the severe conditions, outlined in Part V.D, *supra*; violations while on probation will potentially result in a long prison sentence.

Forfeiture of all property depicting child pornography is ordered. A special assessment of $100 is required. Defendant's current and future financial situation prevents imposition of any fine.

The sentence imposed will provide an opportunity for defendant to succeed in therapy, at school, at attaining employment, and at becoming a functioning and law-abiding member of society. A sentence involving incarceration has been considered and is rejected. All concerned are best served by following this course.

SO ORDERED,

Jack B. Weinstein
Senior United States District Judge

Dated: May _1_, 2013
Brooklyn, New York

**VII. Appendix**

 **A. Professional Background of Experts**

  **1. Richard B. Krueger, M.D.**

- Education
  - B.A., Albion College
  - M.D., Harvard Medical School
- Board certified in internal medicine; psychiatry and neurology, added qualifications in forensic psychiatry and addiction psychiatry
- Associate Clinical Professor of Psychiatry, Columbia University, College of Physicians and Surgeons
- Associate Attending Psychiatrist, New York Presbyterian Hospital, New York, New York
- President Elect, New York State Association for the Treatment of Sexual Abusers
- Member, Education Committee, American Academy of Psychiatry and the Law
- Member, Sexual Health and Disorders Committee of the World Health Organization
- Author or co-author of peer reviewed articles, books, and book chapters pertaining to paraphilic and sexual disorders and sex offender treatment
- Member of professional organizations and societies
- Recipient of numerous fellowships and grants

  **2. Meg S. Kaplan, Ph.D.**

- Education
  - B.A., New York University
  - M.A., New York University
  - Ph.D., New York University
- Associate Clinical Professor of Psychology (in Psychiatry), College of Physicians and Surgeons, Columbia University
- Board Member, New York State Sex Offender Alliance and New York State ATSA
- Chairperson, Special Classification Review Board, Adult Diagnostic & Treatment Center, Avenel, New Jersey
- Member, the New York City Task Force Against Sexual Assault
- Director, Sexual Behavior Clinic, New York State Psychiatric Institute, New York, N.Y.
- Author or co-author of peer reviewed articles, books, and book chapters, monographs and treatment manuals pertaining to paraphilic and sexual disorders and sex offender treatment

- Recipient of numerous grants

### 3.    Douglas Martinez, Ph.D

- Education
  - B.A., Rutgers University
  - M.A., Rutgers University
  - Ph.D., Hofstra University
- New Jersey Certified in Advanced Studies in Child Maltreatment with a Specialization in Child Abuse
- Twenty five years' experience as therapist
- Association for the Treatment of Sexual Abusers 1997 National Graduate Research Finalist
- Recipient of numerous grants

### 4.    Cheryl Paradis, Psy. D.

- Education
  - B.A., Marymount Manhattan College
  - Psy.D., Yeshiva University, Ferkauf Graduate School
  - Post-doctoral training program in marital / sex therapy, State University of New York
- Co-Chair and Professor, Department of Psychology, Marymount Manhattan College
- Clinical Associate Professor, State University of New York, Health Science Center at Brooklyn
- Psychologist II, Kings County Hospital
- Associate Clinical Professor of Psychology (in Psychiatry), College of Physicians and Surgeons, Columbia University
- Author or co-author of articles and book chapters, including "Working with Sex Offenders: The Impact on Practitioners," *in Impact: Working with Sexual Abusers* (S.E. Edmunds, ed.).
- Member of professional associations
- Reviewer for professional journals

### 5.    N.G. Berrill, Ph.D.

- Education
  - B.A., University of Massachusetts
  - M.A., Long Island University

-       o   Ph.D., Vanderbilt University
- Board certified psychologist
- Adjunct Assistant Professor, John Jay College of Criminal Justice
- Director, The New York Center for Neuropsychology & Forensic Behavioral Science
- Member of several professional associations
- Presenter at several workshops on topic of sex offenders

## 6.       Jennifer A. McCarthy, Ph.D.

- Education
  - B.A., Baruch College
  - M.A., John Jay College of Criminal Justice
  - Ph.D., John Jay College of Criminal Justice
- Adjunct Professor, John Jay College of Criminal Justice
- Coordinator, Sex Offender Treatment Program at The New York Center for Neuropsychology & Forensic Behavioral Science
- Twelve years' experience treating sex offenders
- Author of articles on sex offenders and their behavior, including a study comparing contact and non-contact child pornography offenders
- Presenter at conferences and symposia on topic of Internet sex offenders
- Member of professional associations

**B.  Transcript of Conference of Expert Discussion with the Court**

The following reflects pages 15-28 of the transcript of the sentencing hearing held on March 22, 2013.  Elisions and corrections are not indicated.

**The Court:**  I suggest that we proceed this way:  That we swear in all of the experts and have them sit around the table with me.  Whoever is introducing them can indicate their background briefly.  I'll have the detailed background in the reports.  I'll put the questions to them and then we'll have a cross discussion so that they can, as professionals, exchange views as they would in a conference deciding what they would recommend to the court in this case.  The court's probation officer will take party

Is that satisfactory?

**Defense Counsel:**  Yes, your Honor.

**The Government:**  Yes, your Honor.

**The Court:**  All right.  Call the witnesses and have them take seats up here at the table with m please.

**Defense Counsel:**  Dr. Richard Krueger.

**Defense Counsel:**  Dr. Meg Kaplan.  Dr. Cheryl Paridis.

**The Government:**  And the government witnesses include Dr. N.G. Berrill, Dr. Jennifer McCarthy.

**The Court:**  Do you wish them sworn?

**The Government:**  Yes, your Honor.

52

. . . .

[The witnesses were sworn]

. . . .

**The Court:**          I suggest that since we have this distinguished panel before us now, and the panel understands I believe what's of concern to the court, I want to know what treatment the defendant is receiving, what treatment would probably be available were he sent to prison and what is recommended, and does the defendant pose any danger of acting out in the future, and, if he does, what conditions can be imposed to minimize that. And then, if you will, what sentence impositions you would suggest to minimize acting out and to maximize treatment and where it should take place. It would also be useful to know, if I'm going to put him on probation, how long that term should last, in your opinion. I'll make the decision of course.

Are there any other questions?

**Defense Counsel:**          No, your Honor.

**The Government:**          No, judge. Thank you.

**The Court:**          Perhaps if the witness will give his name, beginning with you doctor. And then after that we'll have a discussion to see whether there's any disagreement or additions that anybody wants to provide that may be helpful in sentencing. Proceed, please.

**Dr. Krueger:**          I'm Dr. Richard Krueger. I'm in charge of the treatment program that defendant is currently in and he's been in for approximately two years.

I evaluated him originally. I referred him to Dr. Kaplan for some individual—for individual treatment and eventually to Dr. Martinez, Douglas Martinez, for group treatment.

Pretty much over the past two years, defendant has been in our program. I evaluated him periodically to see how his mood is doing and so on, whether he needs meds.

And, as far as his risk is concerned, he's seen Dr. Mega Kaplan regularly, initially, before he entered the group on a weekly basis and thereafter on a biweekly basis or thereabouts.

He's also been in a group treatment program with Dr. Martinez. This group treatment is focused upon individuals who have indicated sexual offenses. Most of them—most of the offenses, most of the offenders—have involved Internet pornography or also some contact offenses. So that is the treatment he's been in. He's been extremely compliant. Hasn't missed sessions. He has been motivated and has made progress.

I think Dr. Kaplan could speak with perhaps more detail as to his individual psychological progress. That's his treatment that he's receiving now.

In terms of treatment that he would receive in prison, I went through some of the government's presentation and understand that there are a number of treatment programs within the federal system. He may not

be eligible for maximum security programs but for less secure programs. I'm not an expert on this. I can only say we have had a number of patients that have been arrested, charged, sentenced for child pornography, have gone into the federal system and have received no treatment, zero treatment, according to them.

In terms of danger that he might present to the community, I conducted an analysis initially and subsequently and I think that his risk of recidivism is remote and will be reduced further than that by virtue of the usual conditions of federal probation which would include ankle monitoring, certain restrictions in his movement, that kind of thing.

**The Court:** You say will include. They may include.

**Dr. Krueger:** May include. They usually include. There could be monitoring on his computer, at home, this sort of thing.

In terms of what I would recommend for treatment, I think that he should continue in the sort of treatment that he's in now. This has been very intensive. I think there's been no indication that he's had any inclinations or impulses to view child pornography in the two years he's been out and I think that this outpatient treatment could certainly be continued, but I don't think it has to be at the same level of intensity that it's been. I would sort of leave the judgment as to the intensity perhaps being reduced into the future.

In terms of the best situation for this treatment, I think that it should

be continued as an outpatient in the community. The government has recommended that he be incarcerated for a period of time. I think this would disrupt him from the current treatment program that he's in. I think he's now a junior in college. He's much more motivated. He's doing well in college. I think this would interrupt his current integration into the community, his integration into the treatment system to achieve no therapeutic effect.

I think that for purposes of risk it is also not necessary to incarcerate him. He's done fine for the past years as an outpatient. So I would recommend that it would be in his interest and in the community's interest to have a noncustodial sentence.

In terms of the length of probation, this would be a matter of judgment. I would say to be sure something on the order of perhaps five years I think would be my best guess at what I would recommend. This would assure some capability of continuing to monitor him to look for any relapses in viewing child pornography or this sort of thing. He has shown no inclinations and he would be fine. That's broadly what I would say.

I don't know. Is there anything else that I have missed?

**The Court:** Well, I noticed that as a bail condition he was required to leave college, temporarily, correct?

**Defense Counsel:** Yes, your Honor. But upon application you permitted him to return to college and he has done well. I have what I will be submitting to the

court a copy of his grades I believe. What I have here, your Honor, is from the Art Institute of New York City which is where he is currently a student. He made the honor roll having earned a 3.6 GPA. This is thanks to you permitting him to go back to classes.

And I also have a letter from the dean of academic affairs as to his performance and if I could submit these.

**The Court:**          Mark them all as a Court Exhibit.

**Defense Counsel:**          This exhibit consists of two pages.

**The Court:**          Court Exhibit 2.

Now, necessarily, if he goes back to school he will have some contact with juveniles. Do you think that should be permitted?

**Dr. Krueger:**          I don't think there should be any limitations on that. I think that this would impose a condition which would unduly restrict his ability to either obtain employment or attend school.

I think he's had on the order of three polygraphs, which are not scientifically admissible but somewhat coercive. But they have demonstrated or his answers have been that he hasn't had contact offenses. I think that his risk of contact offense in the nature of a public setting is exceedingly, exceedingly remote. I think even if he were to live with a juvenile I would not object to that.

Yes.

**The Court:**          Is there any member of the panel who disagrees?

| | |
|---|---|
| **Dr. Kaplan:** | No. |
| **The Court:** | So probation will not limit, unless circumstances change, his ability to attend school and also to work in situations where he would successfully meet juveniles. |
| **Probation Officer:** | That is correct, your Honor. |
| **The Court:** | Otherwise, those are routine limitations which I don't think should be imposed here. |
| **Probation Officer:** | As we said in the recommendation, we would request that this defendant doesn't cohabitate with any child under 18 unless it's approved by probation. As far as limitations for him to be employed or attend school, we would not place any limitations. |
| **The Court:** | Any objection to that? |
| **Dr. Krueger:** | No. |
| **The Court:** | All right. No objection. Then, I'll impose it, although I'm a little dubious about it. But I'll impose limitations Probation recommends. |
| **Dr. Kaplan:** | Dr. Meg Kaplan. |
| | As his individual therapist, I would like to emphasize how well he has done in treatment and I think it would be really important to continue— to be able to continue this treatment as an outpatient. Again, being in school, socializing with peers I think is really important for him. |
| **The Court:** | And you concur otherwise? |
| **Dr. Krueger:** | I would. |

| | |
|---|---|
| **The Court:** | I'm talking to Dr. Kaplan. |
| **Dr. Kaplan:** | Yes. |
| **The Court:** | Do you want to add anything? |
| **Dr. Kaplan:** | No. Just that he's done really well in therapy, very well. |
| **The Court:** | And what about the term, five years, do you agree that that length would be sufficient? |
| **Dr. Kaplan:** | Yes. |
| **The Court:** | Thank you. |
| **Dr. Pararis:** | Good morning, Dr. Cheryl Paradis. My role here was as an independent evaluator. I don't have a treatment relationship with defendant. I did not do an official risk assessment. I relied on my colleagues who administered many, many appropriate psychological tests to assess his risk assessment. Instead, I focused more on personalities assessment. I believe he's getting the appropriate treatment. He's going to people who are trained to do the treatment that he is receiving. He has been both compliant and I would say not avoiding in any way the treatment. |

He was honest with me about what he had done. I think he still has work to do in treatment. So, I recommend he continue. I think that the idea of probation where he's being monitored for five years is a good idea, that he maintain a relationship with his therapist is a good idea. Contining going to school and college is very important. That's in many ways what

he needs psychologically.  So I don't disagree at all with the recommendation that my colleagues have given.

**The Court:**                    Thank you.  Doctor.

**Dr. Berrill:**                   Dr. N.G. Berrill.

We were asked to perform a diagnostic workup on defendant in connection to the charges.  We have not seen him for treatment.  So I really can't comment on that, although from what I have read the treatment that he is receiving is appropriate.  It follows the model that I would endorse that he be seen individually and in a group.

I might add the polygraph should be integrated into the treatment, just every so often take a look and see how he's doing and complying with the guidelines established by the court.

**The Court:**                    Well, probation is authorized to insist on that.

**Probation Officer:**          Correct.

**Court:**                         Yes.  That, in your judgment, it should be imposed?

**Probation Officer:**          Yes, your honor.

**Dr. Berrill:**                   Apart from that issue, anything else that I have heard conforms with or is consistent with what we found in our workup.  We really don't have anything of significant variance to say.  I'm sure that he can be adequately treated and monitored on probation.

As for the time line, quite often it is five years.  But I really don't make a habit of making recommendations about how long someone should

be in probation.

**The Court:**	I'm not asking for your recommendation. I just want to know whether you think that would be sufficient to meet whatever problem exists here.

**Dr. Berrill:**	Yes. Five years seems like a substantial amount of time. If he's going to relapse one would guess that during that interim there would be evidence of that.

**The Court:**	And Probation will report immediately to the court if there's any sign of relapse.

**Probation Officer:**	That's correct, your Honor.

**Dr. McCarthy:**	Dr. Jennifer McCarthy.

I basically concur with everything the other doctors have said. I think a five year term of probation is good. He seems to have social support. He seems to have family support. It's good that he will continue to attend college. Again, I concur. He definitely needs continuing treatment and he's established, it seems, like a healthy relationship with his therapists and they are working on his treatment. So I concur with everybody.

**The Court:**	There's something in the probation report. Apparently, defendant's father still doesn't know about this.

**The Defendant:**	No, your honor, he doesn't.

**The Court:**	Is there any contraindication as to that? I prefer not to get involved

in that.  That's for the therapist and probation.

**Dr. Krueger:**     I would say it's unusual.  In most cases, parents particularly will know.  In certain cases they don't.  I would have to look at the sort of risk and benefits one way or the other.  I would not make any kind of standard recommendation.

**The Court:**     All right.

Before the Probation service will impose a requirement that the father be informed, you're to take it up with the treating physician to consider the impact.

Does the government's attorney wish to cross-examine?

**The Government:**     No, your honor.

**The Court:**     And the defense counsel?

**Defense Counsel:**     I have no questions of the experts.

**The Court:**     Is there anything any of you wish to add that might be helpful to the court?

**Dr. Paradis:**     No, your Honor.

**Dr. Krueger:**     I would just say he's been in our program.  I think he should be allowed the opportunity to continue if he wishes.  I'm not specifically recommending our program.

**The Court:**     All right.

Well, if there are no further questions, I want to thank each of you. You have been extremely helpful.

| | |
|---|---|
| **Dr. Krueger:** | Thank you, your Honor. |
| **Dr. Berrill:** | Have a good day. |
| **The Court:** | Is there any other evidence either party wishes to submit? |
| **The Government:** | No, your Honor. |
| **Defense Counsel:** | Not at this time, your Honor. |

*       *       *